UNITED STATES of America,

v.

**Terry L. DOWDELL, Defendant.**

**No. CRIM.A.3:02CR00107.**

United States District Court,
W.D. Virginia,
Charlottesville Division.

July 23, 2003.

Jean Barrett Hudson, U.S. Attorneys Office, Charlottesville, VA, for United States.

Frederick Tehodore Heblich, Jr., Charlottesville, VA, for Defendant.

## OPINION

MICHAEL, Senior District Judge.

Before the court are the defendant's Objections to the Presentence Report, submitted April 22, 2003, and "Motion for Downward Departure Based on Mitigating Circumstances," filed May 29, 2003. The court held a hearing on these matters on May 30, 2003 during which the court heard a full exposition of the pertinent issues. For the reasons expressed herein, the court will overrule the defendant's objections and deny the defendant's motion for downward departure.

### I.

Beginning in April 1998 and continuing through 2001, the defendant, Terry L. Dowdell, orchestrated and operated a classic Ponzi or pyramid scheme. The defendant solicited investors for an investment and trading program marketed by Vavasseur Corporation (Vavasseur), a Bahamian corporation owned and operated by the defendant. The Vavasseur program entailed trading of medium term debentures and other private bank debt. Clients were promised returns of at least four percent per week for a minimum of forty weeks of trading activity for their investments, an annual return of 160 percent. The defendant would simply use the money put in by the newest investors to pay earlier investors their promised "profits." Defendant would then misappropriate the remaining funds, transferring at least $29 million to business associates, family, and friends. In January 2001, the Securities and Exchange Commission ("SEC"), later joined by the Federal Bureau of Investigation ("FBI"), initiated an investigation into the Vavasseur program. The investigation to date has identified at least seventy-six di-

rect investors, with an undetermined number of sub-investors, who contributed to the defendant's fraudulent investment program. While the exact amount of investors' loss is as yet unknown, it is estimated to be in excess of $121 million.

In November 2001, in connection with the ongoing investigation, the defendant's assets were frozen. In April 2002 and September 2002, while the SEC's investigation proceeded, the defendant violated this court's order by directing the transfer of over $850,000 from unidentified overseas accounts to Mark and Gregory Smyth in California and then back to himself. For this activity, on February 5, 2003, this court found the defendant in contempt of the court's order.

On December 19, 2002, the defendant pled guilty to twenty counts of an information pursuant to the terms of a written plea agreement. Count One charged him with execution of a securities fraud scheme in violation of 15 U.S.C. § 78j(b). Counts Two through Nine charged him with individual acts of wire fraud in violation of 18 U.S.C. §§ 1343 & 1342, while Counts Ten through Twenty charged specific acts of money laundering in violation of 18 U.S.C. § 1957. In exchange for his guilty plea, the government agreed to for go any further prosecution of the defendant in the Western District of Virginia for any matters arising from the investigation of the named charges. The government also agreed that the defendant's sentence should be determined by reference to the 2000 edition of the *United States Sentencing Guidelines Manual.* Based on the calculations within that manual, the government agreed to recommend a total offense level of twenty-eight, with the possibility of a two-level reduction for acceptance of responsibility should the defendant comply with the terms of the plea agreement. The defendant also agreed to a four-level increase in offense level for his role in leading and managing the charged criminal activity. The plea agreement specifies that the agreed-upon total offense level of twenty-eight is solely a recommendation and expressly recognizes that "the Court is not bound by this recommendation and may sentence up to the maximum provided by law."

## II.

As an initial matter, the court must determine whether the plea agreement entered into by the defendant is of a type, or includes elements of a type, requiring the court either to accept or to reject its terms. Rule 11(c)(1)(A)-(C) of the Federal Rules of Criminal Procedure specifies three types of plea agreements through which the government and the defendant may agree that, upon the entry of a guilty plea, the government will:

(A) not bring, or will move to dismiss, other charges;

(B) recommend, or agree not to oppose the defendant's request, that a particular sentence or sentencing range is appropriate or that a particular provision of the Sentencing Guidelines, or policy statement, or sentencing factor does or does not apply (such a recommendation or request does not bind the court); or

(C) agree that a specific sentence or sentencing range is the appropriate disposition of the case, or that a particular provision of the Sentencing Guidelines, or policy statement, or sentencing factor does or does not apply (such a recommendation or request binds the court once the court accepts the plea agreement).

Fed.R.Crim.P. 11(c)(1)(A)-(C). To the extent that a plea agreement is of the type specified in 11(c)(1)(B), the court must advise the defendant that he has no right to withdraw the plea if the court does not follow the government's recommendation.

Fed.R.Crim.P. 11(c)(3)(B). To the extent that a plea agreement is of the type specified in subsection (A) or (C), the court may accept the agreement, reject it, or defer a decision until the court has reviewed the presentence report. Fed.R.Crim.P. 11(c)(3)(A). If the court chooses to reject a plea agreement of type (A) or (C), the court must so inform the parties and must give the defendant an opportunity to withdraw his guilty plea. Fed.R.Crim.P. 11(c)(5).

The court, in this instance, is presented with a plea agreement which concededly incorporates language embodying elements of both type 11(c)(1)(A) and 11(c)(1)(B) plea agreements. Defendant argues that these provisions render the plea agreement a "hybrid," incorporating both a binding promise of nonprosecution and a nonbinding sentencing recommendation to the court. In the defendant's view, that portion of the plea agreement in which the government agrees to decline further prosecution qualifies as a type 11(c)(1)(A) provision which the court must either accept or reject. The remaining provisions of the agreement, the defendant contends, may be treated as mere nonbinding recommendations entered pursuant to Rule 11(c)(1)(B).

Whether a plea agreement can be characterized as hybrid is a matter of first impression. This issue arises primarily as a result of the 2002 amendments to Rule 11 which reorganize and modify the language concerning types of plea agreements and a court's obligation with regard to acceptance or rejection of plea agreements. As amended, the relevant textual provisions of Rule 11 are neither clear nor easily applied and provide little guidance to the court in resolving this issue. On the one hand, Rule 11(c)(1) treats the available types of plea agreements in the disjunctive, specifying that a plea agreement may embody the government's agreement to perform as described in subsection (A),

(B), or (C). This structure suggests the identified types of plea agreements are exclusive. Such an understanding is supported by the rule's distinct requirements, in 11(c)(3)(A) and 11(c)(4), for judicial consideration of plea agreements "of the type specified" in Rule 11(c)(1)(A) or (C). Conversely, some portions of the rule's text might conceivably be read to support the notion of a hybrid plea agreement. The language used in 11(c)(5) delineates several requirements that apply when a court rejects a plea agreement "containing *provisions* of the type specified in Rule 11(c)(1)(A) or (C)" (emphasis added). The rule causes further indeterminacy by its use of the phrase "to the extent that the plea agreement is of the type specified" in multiple provisions, including 11(c)(3)(A) & (B) and 11(c)(4). It is unclear whether this language is meant to signify that a plea agreement is to be treated as a whole or as comprising distinct and divisible elements to be treated individually. One plausible explanation for the use of the phrase "to the extent that" is that this language is intended to signify not that a plea agreement may take a hybrid form, but rather that a court must treat binding (type 11(c)(1)(A) or (C)) and nonbinding (type 11(c)(1)(B)) plea agreements differently.

The advisory committee Notes for the 2002 amendments are of limited assistance to the resolution of this issue. These notes indicate that the amendments concerning acceptance and rejection of plea agreements are "not intended to make any change in practice," but rather to recognize that a guilty plea and a plea agreement need not be accepted or rejected as a single unit. The advisory committee notes do not specifically discuss the possibility of a hybrid agreement, nor do they provide any explanation for the added and modified language potentially supporting the existence of such agreements.

The lack of clarity of the amended text of Rule 11 has not previously been the subject of judicial determination. Under the prior version of the rule, courts have tended to assume plea agreements should be exclusively categorized as of the (A), (B), or (C) type. The Fourth Circuit Court of Appeals recently made such a presumption in *United States v. Ponce*, 50 Fed.Appx. 614 (4th Cir.2002). In *Ponce*, the defendant and the government entered into a plea agreement providing that the defendant would plead guilty to selected counts of the Indictment, that the prosecution would move to dismiss the remaining counts, and that the district court would be free to impose any sentence determined to be within its lawful discretion. *Id.* at 615–16. Without specifically addressing whether this plea agreement might be considered a hybrid incorporating distinct elements of the type specified in 11(c)(1)(A) and (B), the Fourth Circuit treated the agreement as of "the non-binding variety contemplated by [Rule 11(c)(1)(B)]." *Id.* at 620. The mere presence of a provision in the plea agreement dismissing additional counts against the defendant did not convert the government's sentencing recommendations or stipulations into binding terms. *See id.* at 620–21.

■ While plea agreements have commonly incorporated elements of both type 11(c)(1)(A) and 11(c)(1)(B) agreements, this court is unaware of any situation in which a nonbinding recommendation made pursuant to an 11(c)(1)(B) type plea agreement has been treated as a divisible portion of the whole agreement. This court can find no basis for concluding that the recently amended language of Rule 11 creates a new hybrid form of plea agreement requiring the court to treat its provisions independently. As this court is reluctant to use this occasion to formulate what appears to be a new approach to plea agreements entered pursuant to Rule 11, the plea agreement presented in this case will be treated in its entirety as of the type specified in Rule 11(c)(1)(B).

### III.

The defendant and the government each concede a mutual mistake in their application of the *Guidelines* relied upon to form the plea agreement in this case. Both parties incorrectly believed the 2000 edition of the *United States Sentencing Commission Guidelines Manual* to be the operative guide for calculation of an appropriate sentence. Using the 2000 manual, the parties agreed that the government would recommend a total offense level of twenty-eight. This calculation is now conceded by both the defendant and the government to have been in error, thus the defendant does not object to the court's reliance on the 2002 edition of the Guidelines Manual as required by law. Unfortunately for the defendant, calculation of the applicable guidelines range using the 2002 manual results in a significantly higher offense level—a level of forty-three as determined in the presentence report—than was anticipated in the plea agreement.

The defendant raises five objections to the presentence report. Specifically, the defendant objects to the following: the total offense level assigned in the presentence report as a significant departure from that stated in the plea agreement; the assignment of a two-point upward adjustment for obstruction of justice; the presentence report's failure to apply a three-point downward adjustment in offense level for acceptance of responsibility; and the use of a two-point upward adjustment for abuse of trust. The defendant's final objection, perhaps more aptly characterized as a request, asks the court to consider exercising its discretion to depart from the guidelines in certain circumstances.

Each of the defendant's objections will be addressed in turn. The following discussion of each of the defendant's substantive objections relies upon the factual information the court considers relevant to a decision on these particular matters. By no means should this exposition be treated as an exhaustive catalog of the evidence the court has taken into consideration in reaching its determination.

### A.

■ The defendant first contends that the significant discrepancy between the total offense level assigned in the presentence report and that stated in the plea agreement should serve as a basis for modification of the sentence range required by the Guidelines. The plea agreement, defendant contends, was the product of a results-oriented negotiation aimed at reaching a particular offense level taking into account, among other things, the number and nature of charges brought, the loss figure to be employed, and the defendant's role in the offense. The defendant asserts that he would never have agreed to plead guilty to the counts charged in the information had he anticipated that the result would be a life sentence.

As noted above, this plea agreement was entered into pursuant to Rule 11(c)(1)(B) which provides that the Government will "recommend, or agree not to oppose the defendant's request, that a particular sentence or sentencing range is appropriate or that a particular provision of the Sentencing Guidelines, or policy statement, or sentencing factor does or does not apply (such a recommendation or request does not bind the court)." Fed.R.Crim.P. 11(c)(1)(B). The language of the rule and the attendant advisory committee notes make it quite clear that a plea agreement made pursuant to this provision is "clearly of a different order than the other two [types of plea agreements], for an agreement to recommend or not to oppose is discharged when the prosecutor performs as he agreed to do." Fed.R.Crim.P. 11 advisory committee's note (1979). Because such a plea agreement does not bind the court, it is important that the defendant be aware of the nature of the agreement into which he has entered. The defendant must be made to understand that the plea agreement is not binding on the trial court and that he has no right to withdraw the guilty plea if the court does not follow the recommendation or request. Fed. R.Crim.P. 11(c)(3)(B).

In this case, the defendant was fully apprised of the nonbinding nature of the plea agreement into which he voluntarily entered. Not only is this understanding expressed in the written plea agreement multiple times (and once in bold print), the defendant also verbally expressed such understanding at his guilty plea hearing on December 19, 2002 [1]. Defendant was fully aware of the consequences of his decision to plead guilty pursuant to Rule 11(c)(1)(B), including the maximum statutory penalties he could face. The defendant had ample opportunity to decline to enter into such an agreement, but chose instead to plead guilty in conjunction with its terms. The plea agreement reached in this case is not intended to form a binding agreement, and as such this court is not required to, nor will it, consider imposing a sentence that does not comport with a proper application of the effective Sentencing Guidelines.

---

**1.** During the defendant's guilty plea hearing the defendant expressed his understanding as follows:

    Court: If the sentence is more severe than you expect, do you understand that you will still be bound by your guilty plea and will have no right to withdraw it?

    Defendant: Yes, sir, I do understand that. Dec. 19, 2002 Tr. at 16.

## B.

The defendant next objects to the addition of a two-point upward adjustment in the offense level for obstruction of justice as calculated in the presentence report. The defendant contends that the conduct for which he is subject to coercive civil contempt should not also serve as the basis for an upward adjustment for obstruction of justice. The defendant cites U.S.S.G. § 2J1.2 for the proposition that the court is not required to impose an upward adjustment for obstruction of justice where the defendant has been held in contempt.

■ A defendant may face an upward adjustment of up to two points if he willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the conviction, and the obtrusive conduct related to the either the defendant's offense of conviction and any relevant conduct, or a closely related offense. U.S.S.G. § 3C1.1. One of the types of conduct to which this adjustment applies is "providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense." § 3C1.1 cmt. n. 4. With regard to the effect of a contempt sanction on the propriety of an enhancement for obstruction of justice, the Guidelines state that an enhancement for obstruction of justice should generally not be applied if the defendant is convicted of criminal contempt *Id.* cmt. n. 7. The defendant's reliance on § 2J1.2 in this instance is misplaced as he has not been convicted of criminal contempt but rather found in civil contempt for his violation of this court's orders. The guidelines thus do not afford the defendant any insulation from an obstruction of justice enhancement stemming from conduct for which he was held in civil contempt.

The defendant's interference with the administration of justice is amply detailed by a report made by the SEC. The defendant significantly impeded the investigation, and consequent recovery of defrauded investor funds, in several ways: by denying, when confronted by the FBI, that a transfer of investor funds were in fact used for his own benefit; by failing to terminate his relationship with Vavasseur as represented to the SEC in the early phases of the investigation; by secretly laundering $850,000 of Vavasseur investor money during the pendency of the investigation; and by failing to follow instructions of the Department of Justice to have no further communications with persons operating the Vavasseur program. Because of the nature of the defendant's obstructive activities, he is properly subject to an upward adjustment in offense level for obstruction of justice.

## C.

The defendant next objects to the denial, in the presentence report, of a three-point downward adjustment for acceptance of responsibility. The defendant contends that his admission of culpability as to the crimes to which he pled guilty should serve as the basis for an adjustment for acceptance of responsibility.

A defendant may be eligible for a two-point downward adjustment in the offense level "if the defendant clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). In determining whether a defendant qualifies for this adjustment, appropriate considerations include whether the defendant has "truthfully admitt[ed] the conduct comprising the offense(s) of conviction, and truthfully admitt[ed] or not falsely den[ied] any additional relevant conduct"; and "voluntarily terminat[ed] or withdraw[n] from criminal conduct or associations." *Id.* cmt.

n. 1(a) & (b). Furthermore, a defendant's conduct meriting an enhancement for obstruction of justice ordinarily indicates that the defendant has not accepted responsibility for his conduct, although adjustments may apply under both subsections in extraordinary situations. *Id.* cmt. n. 4.

■ According to the SEC, the defendant failed to disclose that he had directed cash transfers to himself in violation of the asset freeze order. He also directed a false accounting of these funds, as revealed by a letter from a third party turned over on November 15, 2002. The defendant's lack of disclosure of these matters interfered with the investigative efforts of federal law enforcement agencies and suggests he did not fully accept responsibility for his criminal conduct.

Defendant argues that because this conduct took place entirely before and during the plea agreement negotiations, the court should grant a downward adjustment for acceptance of responsibility as a reflection of the defendant's acceptance of culpability and his conduct during the period following his plea. This argument does not, however, account for the defendant's failure to make the government aware of his ongoing criminal conduct during the plea negotiation period. The government, through the investigative efforts of the SEC, only uncovered evidence of the defendant's continued attempts at money laundering in January of 2003, after the plea agreement had been reached. The defendant's delinquency in acknowledging his unlawful conduct at the time he entered his plea of guilty reflects a lack of acceptance of responsibility not meriting a downward adjustment in offense level.

### D.

The defendant next objects to a two-point enhancement for abuse of trust. The defendant argues that he did not abuse a position of trust as the defendant asserted-

ly did not directly (e.g. in-person) solicit funds from investors.

If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, the offense level is to be increased by two levels. U.S.S.G. § 3B1.3. An abuse of position of trust enhancement is applied in cases in which a defendant provides sufficient indicia to a victim that the defendant legitimately holds a position of trust when in fact the defendant does not. The adjustment applies where "the defendant perpetuates a financial fraud by leading an investor to believe the defendant is a legitimate investment broker." U.S.S.G. § 3B1.3 cmt. n. 2.

■ Although the defendant may not have directly solicited investor funds, he nevertheless held a position of trust within the purportedly legitimate investment program he operated. The SEC investigation has revealed that he abused this trust by misleading investors into believing that he had a relationship with Barclay's Bank in the Bahamas and that he had experience in managing the type of program he was offering. Investors were solicited with materials that included a letter of reference from an owner of one of the Templeton mutual funds, a company for which the defendant had worked during the 1980s. Because the defendant used his special skills and an apparently legitimate set of professional credentials to affirmatively represent himself as holding a position of private trust, an offense level adjustment for abuse of trust will be applied.

### E.

The defendant's final objection to the presentence report argues that the presentence recommendation does not reflect an appropriate sentence given the defendant's substantial cooperation with the govern-

ment in both the criminal and civil cases pending against him and the severity of the offenses to which he pled guilty. The defendant asserts that the sentencing range as calculated and set out in the plea agreement should be controlling as it provides for a sentence that fully comprehends the nature of the offense, the amount of money involved, the number of victims, and the defendant's role in the offense. Because the defendant believes that the presentence recommendation fails to take into account all of the facts and circumstances of this case, he requests that the court exercise its discretion to depart downward from the Sentencing Guidelines pursuant to the authority granted to the court by either U.S.S.G. § 6B1.2(b) or U.S.S.G. § 2B1.1.

■ The Sentencing Guidelines provide that in the case of a plea agreement which includes a nonbinding recommendation, the court may accept the recommendation if the court is satisfied that the recommended sentence is within the applicable guideline range, or "the recommended sentence departs from the applicable guideline range for justifiable reasons." U.S.S.G. § 6B1.2(b). The commentary states that departure from the guidelines for justifiable reasons generally should be limited to departures authorized by 18 U.S.C. § 3553(b). U.S.S.G. § 6B1.2 cmt., *referencing* U.S.S.G. ch. 1, pt. A(4)(b). Under 18 U.S.C. § 3553(b), the court shall impose a sentence within the Guidelines range unless "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines." This grant of discretion is intended to permit a court to depart from the guidelines sentence when confronted with an atypical case involving a special feature differing from the "heartland" of conduct normally falling within the applicable guideline. U.S.S.G. ch. 1, pt. A(4)(b). A special feature that is already taken into account by the Guidelines may serve as the basis for a downward departure only where that feature is present to an exceptional degree or in some way makes the case different from the ordinary case where the factor is present. *Koon v. United States*, 518 U.S. 81, 94–96, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).

■ Here, the defendant has not identified any special feature of his conduct that could be called unusual or extraordinary in a sense not contemplated by the Guidelines. The grounds which the defendant asserts as justification for departure—the nature of the offense, the amount of money involved, the number of victims, and the defendant's role in the offense—are all aspects of his conduct otherwise covered by the applicable Guidelines provisions. There appears to be nothing remarkable about the defendant's criminal conduct, at least nothing exceptionally mitigating which would warrant an exercise of the court's circumscribed discretion for conduct already taken into account by the Sentencing Commission. As such, the court declines to grant a downward departure under § 2B1.1 of the Sentencing Guidelines.

The defendant points to U.S.S.G. § 2B1.1 as an alternative basis upon which the court could rely to depart downward from the Guidelines should the court wish to exercise its discretion to do so. The defendant contends that while his conduct is serious and worthy of punishment, the recommendation incorporated in the plea agreement reflects the government's considered determination of an appropriate sentence given all of the facts and circumstances of this case.

In the case of a basic property offense, including fraud and other forms of theft, the Guidelines authorize a sentencing court to depart downward from the

guidelines if "the offense level ... substantially overstates the seriousness of the offense." § 2B1.1 cmt. n. 15(B). Such discretion reflects the Sentencing Commission's recognition that "most fraud statutes cover a broad range of conduct with extreme variation in severity." To guide courts in determining the appropriateness of a departure, the Commission indicates that, "ordinarily, the sentences of criminal defendants convicted of federal offenses should reflect the nature and magnitude of the loss cause or intended by their crimes.... Accordingly, ... loss serves as a measure of the seriousness of the offense and the defendant's relative culpability and is a principal factor in determining the offense level." § 2B1.1 cmt. background.

Although the Guidelines as applied to this case call for the defendant to receive the maximum statutory penalty for each count to which he had pled guilty, there can be no doubt that his conduct mandates the imposition of substantial penalties. His conduct resulted in an estimated loss to defrauded investors of approximately $121 million, a loss which becomes all the more significant given the relatively short period of time within which the crimes were accomplished. Furthermore, the defendant's efforts to conduct and conceal criminal activity both within the United States and abroad reflect a particularly high level of sophistication and complexity. His conduct caused financial harm beyond any this court has previously encountered. Because of the seriousness of the defendant's conduct and after lengthy consideration of his request, the court chooses not to exercise its discretion to depart downward under § 2B1.1.

### IV.

In addition to the specific objections raised with regard to the presentence report, the defendant requests, pursuant to Fed.R.Crim.P. 32 and 18 U.S.C. § 3553(b),

a downward departure from the sentence recommended under the Sentencing Guidelines based on his allegedly substantial assistance in both the criminal and civil investigations concerning his conduct. Specifically, the defendant argues that his cooperation with the SEC and authorities in the United Kingdom justify a downward departure as a mitigating circumstance not adequately taken into account by the Sentencing Commission in establishing the Guidelines. The defendant does not dispute the government's complete discretion to move for downward departures pursuant to U.S.S.G. § 5K1.1 and does not seek to make such a motion.

■ As noted above, under 18 U.S.C. § 3553(b) and U.S.S.G. § 5K2.0, the court shall impose a sentence within the Guideline range unless "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines.... In determining whether a circumstance was adequately taken into consideration, the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission." § 3553(b). The Sentencing Commission's policy statement provides that while a departure may rest on grounds not referred to in the Guidelines, "such cases will be highly infrequent." U.S.S.G. ch. 1, pt. A(4)(b). Mere "dissatisfaction with the available sentencing range or a preference for a different sentence than that authorized by the guidelines is not an appropriate basis for a sentence outside the applicable guideline range." U.S.S.G. § 5K2.0 cmt.

■ A sentencing court considering a downward departure from the Guidelines must first determine whether the basis for the departure is already taken into account by the Guidelines. *Koon v. United States,*

518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). If the special factor is an encouraged factor already taken into account by the Guidelines, the court "should depart only if the factor is present to an exceptional degree or in some other way that makes the case different from the ordinary case where the factor is present." *Id.* at 96, 116 S.Ct. 2035.

The Fourth Circuit Court of Appeals has deemed a defendant's substantial cooperation with the government as a special factor already taken into consideration in the Guidelines by the Sentencing Commission. *United States v. Dorsey,* 61 F.3d 260, 262 (4th Cir.1995). Under the Guidelines, a defendant may benefit from his substantial assistance in two ways: (1) by obtaining a downward adjustment to the offense level if he accepts responsibility for the offense and "timely provides complete information to the government concerning his own involvement in the offense," U.S.S.G. § 3E1.1; or (2) upon motion by the government for downward departure pursuant to U.S.S.G. § 5K1.1. The mere fact that the court may not reward a defendant for cooperation without a motion by the government "does not diminish the adequacy of the consideration given by the Sentencing Commission to the appropriate treatment of cooperating defendants." *Dorsey,* 61 F.3d at 262. Thus, a defendant may not circumvent the government's prerogative to decline to file a § 5K1.1 motion by relying on § 5K2.0. Other appellate courts to consider this question have reached the same result. *United States v. White,* 71 F.3d 920, 928 (D.C.Cir.1995) (concluding that the circumstances surrounding a defendant's cooperation with the government can never be of a kind or degree not adequately contemplated by the Commission); *United States v. Aslakson,* 982 F.2d 283, 284 (8th Cir.1992) (holding that "[c]ooperation with the prosecutors simply cannot be sufficiently extraordinary to war-

rant a departure under § 5K2.0 absent a government motion under § 5K1.1.").

In this case, the defendant's motion presents a somewhat novel argument. He asserts that his assistance to government (and international) agencies not involved in prosecuting his offenses provides a basis for special treatment as these agencies are not empowered to file a § 5K1.1 motion for downward departure. While it is indeed the case that these agencies have no such authority, it is reasonable to assume the Sentencing Commission contemplated that a defendant's substantial cooperation with a variety of government organizations would be taken into consideration by the prosecuting agency in making its discretionary determination to move for downward departure pursuant to § 5K1.1. Furthermore, in this particular case, the defendant's cooperation with any and all domestic law enforcement agencies is required by the terms of the plea agreement. To treat the defendant's contractually mandated cooperation as warranting a downward departure would misconstrue the intended application of § 5K2.0.

### V.

In accordance with the foregoing, the defendant's Objections to the Presentence Report, submitted April 22, 2003, and "Motion for Downward Departure," filed May 29, 2003, shall be DENIED. An appropriate order shall this day enter.

### ORDER

For the reasons stated in the accompanying memorandum opinion, it is this day

### ADJUDGED, ORDERED
### AND DECREED

as follows:

(1) the defendant's Objections to the Presentence Report, submitted April 22, 2003, shall be, and

hereby are, DENIED;

(2) the defendant's "Motion for Downward Departure," filed May 29, 2003, shall be, and hereby is, DENIED.

The Clerk of the Court hereby is directed to send a certified copy of this Order and accompanying Memorandum Opinion to all counsel of record.